# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-2265

_____

United States of America

*Plaintiff - Appellee*

v.

State of Iowa; Kimberly Reynolds, in her official capacity as Governor of Iowa;
Brenna Bird, in her official capacity as Attorney General of Iowa; Iowa
Department of Public Safety; Stephan Kenneth Bayens, in his official capacity as
Commissioner of Iowa Department of Public Safety

*Defendants - Appellants*

------------------------------

Immigration Reform Law Institute

*Amicus on Behalf of Appellant(s)*

American Immigration Lawyers Association; ASISTA Immigration Assistance;
Asian Pacific Institute on Gender-Based Violence; Esperanza United; Tahirih
Justice Center

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: September 26, 2024
Filed: January 24, 2025
_____

Before BENTON, ARNOLD, and KOBES, Circuit Judges.
_____

BENTON, Circuit Judge.

Iowa, in Senate File 2340, criminalized the presence within its boundaries of aliens who illegally reentered the United States. Aliens violating the Act are ordered to return to the country they reentered from. The Act forbids judges from abating a state prosecution due to a pending (or possible) federal determination of the alien's immigration status. The United States sought a preliminary injunction against the enforcement of the Act. The district court[1] granted it. Iowa appeals. Having jurisdiction under 28 U.S.C. § 1292(a)(1), this court affirms.

I.

In Section 2 of the Act, Iowa forbids a "person who is an alien" to enter, attempt to enter, or at any time be found within the state "under any of the following circumstances": having been "denied admission to or . . . excluded, deported, or removed from the United States"; or having "departed from the United State while an order of exclusion, deportation, or removal is outstanding." **Iowa Code § 718C.2(1)(a), (b)**. *See* **§ 718.1(1)** (Section 1, defining "alien" by reference to federal immigration law). Violation is at least an "aggravated misdemeanor." **§ 718C.2(2)**.

If an alien is convicted of violating Section 2, then Section 4 of the Act provides that a judge "shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to

_____

[1]The Honorable Stephen H. Locher, United States District Judge for the Southern District of Iowa.

enter." **§ 718C.4(4)**. Regardless, during an alien's prosecution under the Act, a judge may order return rather than continuing with the prosecution *if* the alien consents and other provisions are satisfied (i.e., the alien has not previously been convicted or ordered to return under the Act, the alien is not charged with another offense punishable as at least an aggravated misdemeanor, and the arresting officer has collected all available identifying information and cross-referenced it with relevant databases to determine if the alien poses a threat to national security). **§ 718C.4(3)**. The order to return must include the manner of transportation to "a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." **§ 718C.4(5)**.

Section 5 of the Act creates a separate offense for failure to comply with the return order. **§ 718C.5**. Section 6 of the Act provides that a court "may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated." **§ 718C.6**.

The United States brought a facial challenge against the Act, alleging it violated the Supremacy Clause of the United States Constitution. Days later, the United States moved for a preliminary injunction against the Act.

The district court ruled that the United States had standing and could state a cause of action to sue to enjoin the Act. Considering the *Dataphase* factors, the court found that the United States "established a likelihood of success on the merits of their position that federal immigration law preempts Senate File 2340 under both conflict and field preemption." *United States v. Iowa*, 737 F.Supp.3d 725, 751 (S.D. Iowa 2024). The court also found irreparable harm if the Act went into effect, adding that the balance of the equities and the public interest favored granting the injunction. *Id.* at 749–50. *See generally Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The district court granted the preliminary injunction. Iowa appeals.

This court reviews decisions on preliminary injunctions for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo. *Sleep No. Corp. v. Young.*, 33 F.4th 1012, 1016 (8th Cir. 2022). A district court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

II.

A federal court must first decide whether plaintiffs have standing. *Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071, 1076 (8th Cir. 2024). This court reviews de novo whether a party has standing. *Dakotans for Health v. Noem*, 52 F.4th 381, 385 (8th Cir. 2022). Plaintiffs have the burden to establish standing. *Animal Legal Defense Fund*, 89 F.4th at 1077. To have standing, a plaintiff must show it suffered an injury in fact, fairly traceable to the defendant, and likely redressable by a favorable decision of the court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The plaintiff must support each element "with the manner and degree of evidence required at the successive stages of litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). "At the preliminary injunction stage, then, a plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Id*. At the preliminary injunction stage, this court assumes the plaintiff's allegations are true and views them most favorably to the plaintiff. *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).

To establish injury in fact, a plaintiff must show it suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339, *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). The United States details several ways the Act may interfere with the enforcement of federal immigration law. The Act may interfere with federal immigration proceedings because an alien "facing SF 2340 enforcement proceedings while a federal determination of their immigration status is pending . . .

-4-

may be impeded from participating in the federal proceedings." Enforcement of the Act may incentivize aliens to move from Iowa to different states, forcing federal officials to expend limited resources to locate them. Also, Iowa's enforcement of the Act may antagonize foreign nations whose citizens are affected, jeopardizing U.S. influence over the flow of illegal immigrants from and through those nations and thus hindering enforcement of federal immigration law. Viewing these facts most favorably to the plaintiff, the United States has clearly shown that enforcement of the Act is likely to invade its legally protected interest in enforcing federal law.

The harm here is particularized and concrete. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339, *quoting **Lujan***, 504 U.S. at 560 n.1. The United States does not state a generalized, undifferentiated grievance, but rather harms particular to itself, including interference with its enforcement of federal immigration law. To be concrete, an injury "must be '*de facto*'; that is, it must actually exist." ***Id.*** at 340. In its complaint and declarations, the United States describes specific harms from enforcement of the Act. The complaint and declarations do not use "broad generalities," nor are the harms "too speculative." *See **McNaught v. Nolen***, 76 F.4th 764, 770 (8th Cir. 2023). The United States has clearly shown it will likely establish a particularized and concrete injury.

Although Iowa has yet to enforce the Act, the injury is "imminent." Future injuries may satisfy the "actual or imminent" requirement for an injury in fact "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." ***Department of Commerce v. New York***, 588 U.S. 752, 767 (2019). A plaintiff must show it is "immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and that the injury or threat of injury must be both real and immediate." ***McNaught***, 76 F.4th at 770. In its complaint and declarations, the United States shows the immediate danger enforcing the Act poses to its enforcement of federal immigration law. Whether this interference is unconstitutional is a question for the merits. *See **Missouri***, 114 F.4th at 985. For standing, what matters is that the United States is likely to show imminent threat to

its legally protected interest. The United States has clearly shown it likely will establish injury in fact.

The injury in fact here is fairly traceable to the Iowa defendants. The injury is fairly traceable to the state of Iowa. *Cf. id.* The Act is enforced by state or local prosecutors, including defendant Attorney General Brenna Bird. *See* **Iowa Code § 13.2(1)(b)** (authorizing the attorney general to prosecute "all actions . . . in which the state may be a party or interested"). The injury is fairly traceable to defendant Governor Kim Reynolds, who may require the attorney general to enforce the Act. *Id.* The injury to the United States does not rest on "speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). That aliens would leave the state of Iowa in response to the Act is a "predictable effect" of the Act "on the decisions of third parties." *New York*, 588 U.S. at 768. Antagonizing foreign nations, and thus harming the ability of the United States to enforce federal immigration law, is not speculative. *See* Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024), https://perma.cc/2VPZ-38E7 (expressing concern by the Government of Mexico about the Act). The United States has clearly shown it is likely to establish that its injury is fairly traceable to defendants.

The injury to the United States is likely redressable by a favorable judicial decision, specifically, an injunction against enforcing the Act, which would prevent state officials from interfering with U.S. enforcement of federal immigration law. *See Missouri*, 114 F.4th at 985.

The United States has met its burden of clearly showing it is likely to establish an injury in fact, fairly traceable to defendants, and redressable by a favorable decision of the court. The United States has standing.

III.

Iowa argues that the United States lacks a cause of action for a violation of the Supremacy Clause of the U.S. Constitution. True, the Supremacy Clause does

not have an implied cause of action. ***Armstrong v. Exceptional Child Center, Inc.***, 575 U.S. 320, 325 (2015). But, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." ***Id.*** at 327. Iowa emphasizes that equitable causes of action must be "grounded in traditional equity practice." ***Whole Women's Health v. Jackson***, 595 U.S. 30, 39 (2021). But this court's precedent identifies an "equitable tradition of suits to enjoin unconstitutional actions by state actors." ***Missouri***, 114 F.4th at 986, *citing* ***United States v. Washington***, 596 U.S. 832, 837 (2022); ***United States v. Minnesota***, 270 U.S. 181, 194 (1926); *and* ***Sanitary Dist. of Chicago v. United States***, 266 U.S. 405, 425–26 (1925). In *Missouri*, this court found an equitable cause of action for the United States to sue to enjoin the implementation of a state law that violated the Supremacy Clause. ***Id.*** The United States has an equitable cause of action to sue to enjoin the enforcement of the Act.

IV.

Evaluating a request for a preliminary injunction, a court must consider: 1. "the threat of irreparable harm to the movant;" 2. "the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties litigant;" 3. "the probability that movant will succeed on the merits;" and 4. "the public interest." ***Dataphase***, 640 F.2d at 113. Probability of success on the merits is the "most significant" factor. ***Carson v. Simon***, 978 F.3d 1051, 1059 (8th Cir. 2020) (per curiam). For a preliminary injunction against the enforcement of an enacted state statute, the moving party must clearly show that it is "likely" to prevail on the merits. ***Planned Parenthood, Minn., N.D., S.D. v. Rounds***, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). *See also* ***Starbucks Corp. v. McKinney***, 602 U.S. 339, 346 (2024).

The United States makes a facial challenge to the Act. Facial challenges are "hard to win." ***Moody v. NetChoice, LLC***, 603 U.S. 707, 723 (2024); ***Reynolds***, 114 F.4th at 669. To prevail, a plaintiff must establish either "no set of circumstances exists under which the law would be valid" or "the law lacks a plainly legitimate

sweep." *NetChoice*, 603 U.S. at 723 (cleaned up). To defeat the facial challenge, Iowa needs to show only that the Act "is constitutional in some of its applications." *See United States v. Rahimi*, 602 U.S. 680, 693 (2024). The question is whether all applications of the Act are preempted by federal law.

Conflict preemption is one way the United States is likely to succeed on the merits. Even if Congress does not expressly preempt state laws in statutory text, conflict preemption occurs either when "compliance with both federal and state regulations is a physical impossibility" or when a state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012); *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000). State laws in conflict with federal law are "without effect." *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 479–80 (2013). If every application of the Act conflicts with federal immigration law, then no application of the Act is constitutional.

True, "a court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Geier*, 529 U.S. at 885. Rather, "the proper approach is to reconcile the 'operation of both statutory schemes with one another rather than holding one completely ousted.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127 (1973). Further, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400. Iowa emphasizes that the presumption against preemption "has greatest force when Congress legislates in an area traditionally governed by the States' police powers." *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014).

But immigration is not a traditional subject of state regulation. To the contrary, the Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). The United States "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394.

Congress has the power to "establish an uniform Rule of Naturalization." **U.S. Const.** art. I, § 8. The United States has inherent power as sovereign to control and conduct relations with foreign nations. *See **United States v. Curtiss-Wright Export Corp.***, 299 U.S. 304, 318 (1936). "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation." ***Arizona***, 567 U.S. at 395. *See **Hines v. Davidowitz***, 312 U.S. 52, 64 (1941) ("One of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country."). Decisions about the removal of illegal aliens "touch on foreign relations and must be made with one voice." ***Arizona***, 567 U.S. at 409. For these reasons, the greatest presumption against preemption likely should not apply.

On the other hand, in the early days of the nation, states did enact laws to exclude from their borders certain aliens, including alien convicts and alien paupers. ***Id.*** at 419 (Scalia, J., concurring in part and dissenting in part). Iowa argues that its Act is not a regulation of removal, but rather is an exercise of the inherent and traditional state power to "exclude" persons. The Supreme Court has declined to "decide for or against the right of a State, in the absence of legislation by Congress, to protect herself by necessary and proper laws against paupers and convicted criminals from abroad." ***Chy Lung v. Freeman***, 92 U.S. 275, 280 (1876).

Even assuming Iowa possesses an inherent and traditional power to exclude, Iowa's Act still violates the Supremacy Clause if it clearly conflicts with federal law. *See **Gade v. National Solid Wastes Management Ass'n***, 505 U.S. 88, 108 (1992) (holding that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield"). *See also **Mayor, Aldermen and Commonality of the City of New York v. Miln***, 36 U.S. 102, 143 (1837) (applying conflict preemption analysis even after concluding the state law in question was an exercise of the state's police powers). There is no absence of legislation from Congress here. "Federal governance of immigration and alien status is extensive and complex. Congress has specified categories of aliens who may not be admitted to the United States. . . . Unlawful entry and unlawful reentry into the

country are federal offenses." ***Arizona***, 567 U.S. at 395. "Congress has specified which aliens may be removed from the United States and the procedures for doing so." ***Id.*** at 396.

Determining whether every application of Iowa's Act is likely conflict-preempted requires interpreting both the Act and federal law. *See **Crosby v. National Foreign Trade Council***, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.").

A.

Section 2 of the Act provides:

> A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state under any of the following circumstances:
> *a.* The person has been denied admission to or has been excluded, deported, or removed from the United States.
> *b.* The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

**Iowa Code § 718C.2(1)**. The penalty for violating the Act includes a fine of at least $855.00 and/or imprisonment not longer than two years. **§§ 718C.2(2)**, **903.1(2)**.

Similarly, federal law criminalizes illegal reentry, establishing fines and/or imprisonment not longer than two years for "any alien who has been denied admission, excluded, deported, or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter enters, attempts to enter, or is at any time found in, the United States." **8 U.S.C. § 1326(a)**. In effect, Section 2 of the Act "adds a state-law penalty for conduct proscribed by federal law." ***Arizona***, 567 U.S. at 400.

But unlike the federal crime of illegal reentry, Section 2 has no exceptions. Under federal law, the Attorney General may expressly consent to an alien's reapplying for admission, or the alien may establish "that he was not required to obtain such advance consent." **8 U.S.C. § 1326(a)(2)**. Section 2 likely conflicts with federal law because it applies to aliens whom federal law, and federal officials acting under federal law, may exempt from the federal crime of illegal reentry.

Iowa argues that the Act should be interpreted not to conflict with federal law. Iowa emphasizes its canons of statutory interpretation. It is presumed: "A just and reasonable result is intended." **Iowa Code § 4.4(3)**. It is also presumed: "Compliance with the Constitutions of the state and of the United States is intended." **§ 4.4(1)**. Interpreting state laws, this court "follows the state court's interpretation, or if unavailable, uses that state court's rules of construction." *Metropolitan Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, 991 F.3d 880, 884 (8th Cir. 2021). Iowa stresses the Iowa Supreme Court doctrine: "If the law is reasonably open to two constructions, one that renders it unconstitutional and one that does not, the court must adopt the interpretation that upholds the law's constitutionality." *State v. Abrahamson*, 696 N.W.2d 589, 593 (Iowa 2005). *See Star Equip., Ltd. v. Iowa Dep't of Transp.*, 843 N.W.2d 446, 457 (Iowa 2014) (reiterating that "statutes are cloaked with a presumption of constitutionality").

Iowa interprets Section 2 of the Act to include all the federal law's exemptions, claiming this is the ordinary meaning of Section 2. When determining the ordinary and fair meaning of the language of a statute, the Iowa Supreme Court considers "the language's relationship to other provisions of the same statute and other provisions of related statutes." *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020). Iowa reads the Act's language not to apply to aliens exempt from the federal crime of illegal reentry. Iowa argues that a person who renters the United States with permission under federal law does not enter "under any of the following circumstances" of having been denied admission, excluded, deported, or removed. **Iowa Code § 718C.2(1)**. At least, Iowa urges, the ordinary meaning is ambiguous, so Iowa's canon of constitutionality requires reading Section 2 to include the federal

law's exemptions. *See **Abrahamson***, 696 N.W.2d at 593. Because Section 2 criminalizes only what is already a federal crime, Iowa believes that the Act will not create any new implications for foreign relations. Further, according to Iowa, federal immigration law defenses can be raised by aliens in state courts, and state courts will be able to rely on federal immigration decisions. As a result, state judges will not make decisions about an alien's admissibility or removability. Iowa concludes that Section 2 does not conflict with federal immigration law.

Iowa asks this court to ignore the plain text of the statute. *See **State v. Doe***, 903 N.W.2d 347, 351 (Iowa 2017) (providing that the Iowa Supreme Court first considers the plain meaning of the relevant language of a statute, read in the context of the entire statute, then applies other tools of statutory interpretation only if there is ambiguity). The plain text of Section 2 has no exceptions.

Even accepting Iowa's interpretation, Section 2 is still an obstacle to the exercise of the discretion that Congress gives to federal officials charged with enforcing federal immigration law. *Cf. **United States v. Texas***, 97 F.4th 268, 289 (5th Cir. 2024). *See also **Geo Group, Inc., v. Newsom***, 50 F.4th 745, 762 (9th Cir. 2022) (en banc) ("Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption."). Federal immigration law grants broad discretion to federal officials. *See, e.g.*, ***Bouarfa v. Mayorkas***, ___ S.Ct. ___, ___, 2024 WL 5048700, at *2 (Dec. 10, 2024) ("A common feature of our Nation's complex system of lawful immigration is mandatory statutory rules paired with discretionary exceptions."); ***Patel v. Garland***, 596 U.S. 328, 332 (2022) (describing the discretion granted to the Attorney General, subsequently delegated to immigration judges, to grant or not grant eligible noncitizens relief from removal); *Newsom*, 50 F.4th at 751 (describing the "broad discretion" given to the Secretary of Homeland Security to choose the place to detain deportable aliens); ***Trump v. Hawaii***, 585 U.S. 667, 683–84 (2018) (describing the "broad discretion" granted to the President to suspend the entry of aliens into the United States); *Arizona*, 567 U.S. at 396 (describing "broad discretion exercised by immigration officials" as a "principal feature of the removal system"); ***INS v. Aguirre-Aguirre***, 526 U.S. 415,

424–25 (1999) (describing the statutory grant of authority to the Attorney General to determine whether the statutory conditions for withholding removal of an alien are met). Discretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law. It "embraces immediate human concerns." *Arizona*, 567 U.S. at 396. Due to "resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *United States v. Texas*, 599 U.S. 670, 680 (2023). Federal officials might choose to prioritize the arrest of an alien who commits a serious crime, rather than pursue enforcement against an alien who "has children born in the United States, long ties to the community, or a record of distinguished military service." *Arizona*, 567 U.S. at 396. "Some discretionary decisions involve policy choices that bear on this Nation's international relations." *Id.*

Even if Section 2 of the Act had the same exceptions as federal law, the state law still conflicts with federal law because it creates a parallel scheme of enforcement for immigration law. Under Section 2, Iowa could prosecute an illegal alien whom federal officials have exercised their discretion not to bring an enforcement action against. *Cf. id.* at 402 (expressing disapproval of a state having "the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies"). Also, creating a separate state offense eliminates the possibility of a presidential pardon. *Id.* at 403. Contrary to Iowa's belief, Section 2 does complicate U.S. foreign relations. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395. *See also Crosby*, 530 U.S. at 382 (describing how a state law that violated the Supremacy Clause undermined the President's "effective diplomacy"), *citing Chy Lung*, 92 U.S. at 279. Section 2 of the Act would "allow the State to achieve its own immigration policy," precisely the result the Supreme Court in *Arizona* found barred by conflict preemption. *Arizona*, 567 U.S. at 408.

Iowa urges, "Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap." **Kansas v. Garcia**, 589 U.S. 191, 212 (2020). In the "vast majority of cases where federal and state laws overlap," this is likely true. **Id.** But not here. Federal immigration law allows the Attorney General to enter into agreements with a state to enable state officers to enforce federal law "in relation to the investigation, apprehension, or detention of aliens in the United States." **8 U.S.C. § 1357(g)(1)**. By allowing state officers to arrest aliens who federal officials have not decided to arrest, or asked state officers to help arrest, Section 2 of the Act likely conflicts with federal immigration law. *See also* **Texas**, 97 F.4th at 292–93. Even under Iowa's narrow reading, Section 2 of the Act permits state officials to arrest illegal aliens for violating the state crime of illegal reentry. This authority "could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case." **Arizona**, 567 U.S. at 408. The result of Section 2 "could be unnecessary harassment of some aliens . . . who federal officials determine should not be removed." **Id.**

Arresting an alien for illegal reentry, Iowa argues, does not implicate foreign affairs any more than arresting an alien for another state crime, like murder. To the contrary, enforcing a generally applicable state crime like murder does not necessarily allow a state to "achieve its own immigration policy." *See* **id.** (finding that a generally applicable state law *did* conflict with federal immigration law because it empowered officers to arrest persons whom they had probable cause to believe committed removable offences). *Cf.* **Kansas**, 589 U.S. at 210–12 (finding a generally applicable state law criminalizing identity-theft *not* conflict-preempted as applied to illegal aliens who wrote fraudulent social security numbers on their tax-withholding forms). Section 2 of the Act is not a generally applicable law. It applies only to aliens. **Iowa Code § 718C.2(1)**. Section 2 would allow Iowa to "achieve its own immigration policy," ignoring the discretionary decisions of federal officials. *Arizona*, 567 U.S. at 408. The effects of Section 2 go beyond just upsetting "the criminal law enforcement priorities or preferences of federal officers." **Kansas**, 589

U.S. at 212. The Executive's enforcement discretion in immigration law "implicates not only 'normal domestic law enforcement priorities' but also 'foreign policy objectives.'" *Texas*, 599 U.S. at 679. Section 2 of the Act empowers Iowa to contradict the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal immigration officials, frustrating U.S. law enforcement and foreign policy interests. Thus, Section 2 of the Act likely conflicts with federal law. *See Arizona*, 567 U.S. at 395 ("The federal power to determine immigration policy is well settled.").

B.

Section 4 of the Act provides:

> Upon a person's conviction of an offense under this chapter, the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter. . . .
> . . . .
> An order issued under this subsection must include all of the following:
>     *a.* The manner of transportation of the person to a port of entry.
>     *b.* The law enforcement officer or state agency responsible for monitoring compliance with the order.

**Iowa Code § 718C.4(4), (5)**. Section 4 has no exceptions to the requirement that a judge issue this order.

By contrast, federal law provides federal officials discretion about the removal of aliens who reentered the United States. Federal law provides that if "the Attorney General finds an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal," then "the alien shall be removed under the prior order at any time after the reentry." **8 U.S.C. § 1231(a)(5)**. Because Section 1231(a)(5) applies only to aliens who "illegally" reentered the United States, an exception to the crime of reentry is also an exception to removal under this provision. Even for aliens who illegally reenter the country,

federal immigration officials may allow the withholding of removal for an illegal alien who "expresses a fear of returning to the country designated in [his reinstated order of removal]." *See* **8 C.F.R. § 241.8(e)**.

In *Arizona v. United States*, the Supreme Court found conflict-preempted a provision of state law allowing officers to arrest persons whom they had probable cause to believe committed removable offenses. *Arizona*, 567 U.S. at 407. Iowa's Act regulates removal more than the Arizona provision did. The Act creates a removable offense at the state-level. Further, Section 4 of the Act creates state procedures for removing aliens who violate the state law. Thus, Section 4 "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* at 396. Congress has created many exceptions to the removal of illegal aliens. *See, e.g.*, **8 U.S.C. § 1158(a)(1)** (allowing persons currently in the United States unlawfully to apply for asylum); **8 U.S.C. § 1254a(a)(1)(A)** (enabling the Attorney General to grant temporary protected status). *See also* **Patel**, 596 U.S. at 332; **Aguirre-Aguirre**, 526 U.S. at 424–25. Federal officials "as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. Because Section 4 of the Act undermines the discretion of federal officials to decide who will be removed, it likely conflicts with federal immigration law.

Section 4 also likely conflicts with federal regulations over *where* to remove an alien to. Federal law restricts the removal of an illegal alien to a country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." **8 U.S.C. § 1231(b)(3)(A)**. Instead, federal law provides the Attorney General with a variety of other countries to which the illegal alien may be removed. **8 U.S.C. § 1231(b)(2)(A), (D), (E)**. This discretion is important for U.S. foreign relations. *See **Jama v. Immigration and Customs Enforcement***, 543 U.S. 335, 348 (2005) ("Removal decisions, including selection of a removed alien's destination, 'may implicate our relations with foreign powers'

and require consideration of 'changing political and economic circumstances.'"). By contrast, Section 4 of the Act mandates only one destination for an illegal alien. Under Section 4, an illegal alien may be ordered to return to a country to which, under federal law, the Attorney General decided the alien must not be sent. Ordering an alien to return to one specific country contradicts federal officials' discretion in determining where to remove the alien to. *Cf. Texas*, 97 F.4th at 291.

Iowa argues that the Act, properly interpreted, does not actually regulate the removal of illegal aliens from the United States. The Iowa Supreme Court presumes the state's statutes have no effect beyond the state's borders "unless the legislature clearly expresses otherwise." *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018). Finding no clear expression in the text or legislative history of the Act, Iowa argues Section 4 does not regulate the removal of illegal aliens from the United States because it has no force beyond the borders of Iowa. Instead, Iowa claims Section 4 of the Act requires only the transportation of convicted aliens to a "port of entry" within Iowa, specifically the Des Moines International Airport. **Iowa Code § 718C.1(2)**; **19 C.F.R. § 101.3(b)(1)**.[2] Iowa emphasizes that federal officials retain discretion at Des Moines International Airport to decide whether to remove an alien from the United States.

Once again, Iowa asks this court to ignore the plain text of the statute. *Doe*, 903 N.W.2d at 351. Section 4 requires a judge to issue an order to an alien, not to exit the state, but to "return to the foreign nation from which the person entered or attempted to enter." **Iowa Code § 718C.4(4)**. Then, Section 5 of the Act does not criminalize failing to leave Iowa, but rather failing to "comply with the order." **§ 718C.5(1)(c)**. Section 5 reiterates that the order is "to return to the foreign nation from which the person entered or attempted to enter." **§ 718C.5(1)(b)**.

---

[2]The Code of Federal Regulations lists two ports of entry in Iowa. But the district court noted that the Quad Cities International Airport is in Moline, Illinois, outside the territory of Iowa. *Iowa*, 737 F.Supp.3d at 734 n.2. Iowa maintains that the only port of entry state officers may transport illegal aliens to under Section 4 is the Des Moines International Airport.

Further, the Supreme Court looks also to the effects of a state law when deciding whether it conflicts with federal law. *See Perez v. Campbell*, 402 U.S. 637, 651–52 (1971). The effect of Section 4, even as Iowa interprets it on appeal, is to deliver aliens to the Des Moines International Airport with an order to leave the United States or face further criminal penalties for refusing to obey. The effect of the Act is for illegal aliens not just to leave Iowa but to remove themselves from the United States entirely. Section 4 thus "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409.

Even if Section 4 of the Act left the decision on removal to federal officials, Section 4 would still obstruct their discretion. Delivering an illegal alien to federal officials at a port of entry forces officials to decide what to do with that alien, a decision they may have postponed. Instead, federal law anticipates that state officers have a more limited role: without a prior agreement, they may "communicate with the Attorney General regarding the immigration status of any individual" or "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens." **8 U.S.C. § 1357(g)(10)(A), (B)**. *See Arizona*, 567 U.S. at 410 (disapproving, as outside any "coherent understanding" of the word "cooperate," "the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government"). Section 4 of the Act interferes with the discretion that federal immigration law commits to federal officials in removal decisions, so it is likely conflict-preempted.

C.

Section 6 of the Act obstructs the discretion of federal officials: "A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated." **Iowa Code § 718C.6**. Even if federal officials are considering an alien's case, Iowa may arrest the alien, prosecute the alien, obtain an order to return, and

transport the alien to a port of entry. By prohibiting abatement of the state prosecution, Section 6 undermines federal officials' discretion to decide if, when, and how to address the case of an individual alien.

Iowa applies the *expressio unius est exclusio alterius* canon of statutory interpretation. *See, e.g.*, **Kucera v. Baldazo**, 745 N.W.2d 481, 487 (Iowa 2008) (describing that "the express mention of one thing implies the exclusion of others not so mentioned"). Iowa interprets Section 6 to *require* abatement after federal officials make a final determination of an alien's status. Distinguishing "abatement" from a voluntary stay of proceedings, Iowa also argues that a state court might voluntarily stay a state prosecution on the basis that a federal determination is pending or yet-to-be initiated.

But the potential for discretionary stays by state judges does not prevent conflict preemption. The decision to stay proceedings remains within the discretion of state courts, so Iowa still could make its own immigration policy. Under the current scheme of federal immigration law, the United States need not depend on the *noblesse oblige* of the states. *Cf. **United States v. Stevens***, 559 U.S. 460, 480 (2010). Federal immigration law bars states from making their own immigration policies. **Arizona**, 567 U.S. at 408. Despite the potential for discretionary stays by judges (or discretionary non-enforcement by state prosecutors), the Act likely conflicts with federal immigration law. *See also **Texas***, 97 F.4th at 289 (observing that "even if state law afforded discretion, it would vest that discretion in a *state official*, not the United States Attorney General or another federal officer. That is in conflict with federal law").

The United States has clearly shown that its facial challenge is likely to succeed on the merits because every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See **Texas***, 97 F.4th at 288–94 (holding conflict-preempted a Texas law that

criminalized illegal reentry, provided for removal, and prohibited abatement with language nearly verbatim to Iowa's Act).[3]

## V.

Another *Dataphase* factor is "the threat of irreparable harm to the movant." ***Dataphase***, 640 F.2d at 113. An irreparable harm occurs when "a party has no adequate remedy at law." ***Sleep No. Corp.***, 33 F.4th at 1018. To establish the threat of irreparable harm, a party "must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." ***Cigna Corp. v. Bricker***, 103 F.4th 1336, 1346 (8th Cir. 2024). The district court found several potential irreparable harms if the Act went into effect, including "judges requiring noncitizens to return to countries where they might not be accepted or might face persecution or torture, in violation of federal laws and treaties," "noncitizens being delivered to a port of entry with no clear mechanism for what happens next," and "corresponding impacts on international relations and foreign affairs." ***Iowa***, 737 F.Supp.3d at 750.

---

[3]Iowa misses the mark by spotlighting *Texas v. United States Department of Homeland Security*, 123 F.4th 186 (5th Cir. 2024). There, Texas sued to enjoin the Department of Homeland Security from unnecessarily cutting the concertina wire that the state had installed along the U.S.-Mexico border. The Fifth Circuit stated this did not conflict with 8 U.S.C. § 1357(a)(3). Iowa argues that if Texas' physical barriers did not trigger conflict preemption, then Iowa's enforcement of the Act does not. But Iowa overreads that case. First, preemption was not the legal issue in that case. Indeed, that issue was forfeited. ***Id.*** at 209. The court mentioned preemption only in passing after addressing intergovernmental immunity, which the Department asserted in response to Texas' suit. ***Id.*** at 205. Second, the focus of any preemption dicta was a federal law granting federal officers "access to private lands" within 25 miles of the border. **8 U.S.C. § 1357(a)(3)**. The Fifth Circuit held that federal officials cut the wire unnecessarily because they "already had 'access' to both sides of the fence." ***Texas***, 123 F.4th at 207. Texas did not sue to stop the Department from cutting the wire when necessary under Section 1357(a)(3). ***Id.*** at 208. Contrary to Iowa's reading, the Fifth Circuit did not address whether Texas could put up the wire, but only whether it could sue to enjoin the Department's unnecessary cutting.

This court reviews the district court's finding of irreparable harm for clear error. *Sleep No. Corp.*, 33 F.4th at 1018. This court's scope of review is "very limited." *Id.* The district court did not clearly err in concluding the United States demonstrated the harm is certain, great, and imminent. Iowa seeks to enforce the Act. The United States has explained how the enforcement of the Act could strain its resources for enforcing federal immigration law and harm its relationships with foreign nations. These harms remain even under Iowa's interpretation of the Act. These harms are "more than mere speculation." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023). At least some of these harms cannot be fully remedied by legal relief. *Cf. Medicine Shoppe Intern., Inc. v. S.B.S. Pill Dr. Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (describing harm to a business's reputation and goodwill built up over several years as "difficult, if not impossible, to quantify in terms of dollars"). The district court did not clearly err in finding irreparable harm.

For the final two *Dataphase* factors, the district court concluded the balance of the harms and the public interest favored granting the preliminary injunction. When a state is the nonmoving party, the public interest and the balance of the harms merge into one factor. *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022). Preventing a state from enforcing an enacted law does harm the state. *Abbot v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). Iowa also emphasizes that if it cannot enforce the law, it will suffer harms from the presence of tens of thousands of illegal aliens within its borders. Nevertheless, the district court concluded that the federal interest prevailed over state interests in the areas of immigration and foreign affairs. *Iowa*, 737 F.Supp.3d at 750. This court reviews for abuse of discretion the district court's balancing of the harms and weighing of the public interest. *See, e.g.*, *Cigna Corp.*, 103 F.4th at 1348–49. In light of the Supreme Court's emphasis on the importance of immigration policy to United States, *Arizona*, 567 U.S. at 395–97, this court concludes the district court did not abuse its discretion in finding the balance of the equities favored enjoining the enforcement of the Act.

The district court did not abuse its discretion in granting the preliminary injunction.

* * * * * * *

The order is affirmed.

_____